**In re ADELPHIA BUSINESS SOLUTIONS, INC., et al., Debtors.**

**No. 02–11389(REG).**

United States Bankruptcy Court, S.D. New York.

June 25, 2002.

---

Weil Gotshal & Manges, New York City, by Judy Liu, Jeffrey Weinberg, Brian A. Haskel, Timothy E. Graulich, for the debtors.

Kramer Levin Naftalis & Frankel, LLP, New York City, by Robert T. Schmidt, Mitchell A. Seider, for the Official Committee of Unsecured Creditors.

Akin Gump Strauss Hauer & Feld, LLP, New York City, by Ira S. Dizengoff, for Informal Committee of Secured Noteholders.

Willkie Farr & Gallagher, New York City, by Morris J. Massel, Buchanan In-

gersoll, New York City, by E. Lee Smith, David J. Molton, Joy Conti, for Adelphia Communications, Inc.

Sidley Austin Brown & Wood, LLP, New York City, by Heike M. Vogel, for CIT Group.

Jaspan Schlesinger Hoffman, LLP, Garden City, NY, by Lisa M. Golden, for the SBC Affiliates.

Stinson, Mag and Fizzell, P.C., Kansas City, Missouri, by Mark S. Carder, Salomon Green & Ostrow, P.C., New York City, by Alec P. Ostrow, Gary I. Selinger, for Sprint Communications Company, L.P. and affiliated Sprint local telephone companies.

Wilmer Cutler & Pickering, Washington, DC, by Philip D. Anker, Arnall Golden Gregory, LLP, Macon, Georgia, by James P. Smith, for the Verizon Operating Telephone Companies.

Lowenstein Sandler, PC, Roseland, NJ, by Lance T. Eisenberg, for AT & T Corporation.

Kilpatrick Stockton, LLP, Atlanta, Georgia, by Paul M. Rosenblatt, for BellSouth Telecommunications, Inc.

*MEMORANDUM DECISION ON MOTION, UNDER BANKRUPTCY CODE SECTION 366, FOR DETERMINATION THAT UTILITIES HAVE BEEN PROVIDED WITH ADEQUATE ASSURANCE OF FUTURE PERFORMANCE*

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in a case under chapter 11 of the Bankruptcy Code, the Debtors, providers of telecommunications services, have moved for an order, under section 366 of the Bankruptcy Code, determining that they have provided adequate assurance of payment to their utility vendors—overwhelmingly, other telecommunications providers.

The Debtors have contended that the combination of their record of prepetition payment and the allowance to their utilities of an administrative expense for postpetition service is sufficient to provide those utilities with adequate assurance of payment. Four telecommunications providers—BellSouth, Verizon, Southwestern Bell (or "SBC Affiliates") and Sprint (several of which have also objected on behalf of affiliates, which have separate relations with one or another of the Debtors) (the "Objecting Utilities")[1]—contend that such is insufficient, and three of them argue that adequate assurance to them requires payment of security deposits to them, in an aggregate amount in excess of $14 million. Two request prepayment of their charges as well.[2]

While the Court determines that the Debtors' proffered basis is insufficient to provide the adequate assurance that section 366 requires, the Court determines that adequate assurance does not, under the facts of this case, now require the deposits and prepayments requested by the Objecting Utilities, which would drain the Debtors of all of their cash, and be highly prejudicial to the interests of all of the other creditors in this case. The Court's conclusion in this regard is rein-

---

**1.** Another, AT & T, has withdrawn its objection upon discovering that its obligors are non-debtor affiliates of the Debtors. The Debtors have also received a number of letter requests from utilities (some of which were from non-telecommunications providers, such as power companies) for adequate assurance, albeit without formal objections or citations of legal authority, and typically in considerably smaller amounts.

**2.** A third seeks that as an alternative.

forced by facts in this case—absent in many, if not most, chapter 11 cases, though they appear to be common in the telecommunications industry—that the Debtors have relationships going in *both* directions with the Objecting Utilities; that the Debtors are creditors of, and not just debtors to, the Objecting Utilities; and that the Objecting Utilities may well owe the Debtors amounts substantially in excess of the deposits the Objecting Utilities demand.

In connection with the latter matters, the Court concludes that under the totality of the circumstances analysis that bankruptcy courts in this Circuit employ in section 366 "adequate assurance" determinations, the Court can and should consider, in addition to the usual factors, the fact that obligations run in each direction, and that there are bona fide disputes as to the amounts the Debtors and their counterparties owe to each other—especially as to the Debtors' contention that their counterparty utilities may owe the Debtors more than $200 million, an amount dwarfing the Debtors' monthly charges going in the other direction; indeed, any alternative course would be to look at the issue with blinders. The Court further concludes that under that same totality of circumstances analysis, the Court can and should try to gauge the bona fides and materiality of debtor contentions that a utility has debts running back to the debtor, but that it is inappropriate for the Court, on a section 366 motion, to either determine the complex disputes between a debtor and its counterparties with respect to the amounts each owes to the other, or accept either side's *ipse dixit* assertions with respect to the merits of the parties' disputes. Utilities' legitimate needs and concerns in this regard can be satisfactorily addressed by permitting and encouraging the parties to proceed with an expedited resolution of their disputes with each other, and by making this Court's adequate assurance determinations without prejudice to expedited reconsideration after issues with respect to the underlying disputes have been resolved.

Subject to the imposition of safeguards that the Court will impose—which are numerous, about triple the number imposed in the *Caldor* case, discussed below—the Court finds that the Objecting Utilities will have adequate assurance without the necessity for the estate to make deposits or otherwise sacrifice critical liquidity to meet the Objecting Utilities' demands.

Though with exceptions not material here, Fed.R.Civ.P. 52, made applicable in contested matters under Fed.R.Bankr.P. 9014, does not require findings of fact and conclusions of law on motions, the Court believes that under the circumstances they are desirable here, and the following are the Court's findings of fact, conclusions of law, and bases for the exercise of its discretion in connection with this motion.

### *Facts*[3]

#### 1. The Debtors And Their Business

The Debtors are telecommunications providers, engaged in the marketing of voice, data and internet services, operating in about 50 geographic markets in the United States, principally to business cus-

---

**3.** In connection with the motion, the Court held a two-day evidentiary hearing, accepting proffers as a means of expediting the introduction of the parties' evidence in chief, and then providing for live cross-examination. All four of the Objecting Utilities took advantage of the opportunity to cross-examine, and most put on proffers of their own evidence.

Unless otherwise stated, the facts are as established by the evidence at that hearing, and speak of the circumstances as of that time.

tomers.[4] On March 27, 2002 (the "Commencement Date"), the Debtors commenced cases under chapter 11 in this Court. They continue to operate their businesses and manage their properties as debtors in possession.

In addition to Debtor Adelphia Business Solutions (the "Parent"), the Debtors include many, but less than all, of the subsidiaries of the Parent; other subsidiaries of the Parent, which are profitable and/or not in financial distress, are not debtors under the Bankruptcy Code.[5] The ABIZ Entities, whose services include "local switch dial tone" service (i.e., local phone service), have availed themselves of opportunities opened up to telecommunications providers to compete with the earlier providers of local phone service—frequently former "Baby Bells," or the companies that are now, in whole or in part, the successor by merger to the Baby Bells—in providing services to retail customers. In 1996, Congress adopted the Telecommunications Act of 1996 (the "1996 Act") to promote competition in the local exchange service markets.[6] Before the 1996 Act was enacted, the prior providers of local phone service—referred to as "Incumbent Local Exchange Carriers," or "ILECs"—had, at least in substantial part, a monopoly on local service. Newcomers like the ABIZ Entities who entered the market came to be referred to as "Competitive Local Exchange Carriers," or "CLECs."[7]

### 2. Relations Between Debtors And Objecting Utilities

Telecommunications services are frequently provided by means of interconnection agreements between different communications services providers, including interconnection agreements with the ILECs, who are at least generally the dominant carriers in their respective markets.[8] Thus the ABIZ Entities, like other CLECs, avail themselves of hardware and services provided by the ILECs, which are needed to provide the necessary services to the ABIZ Entities' customers.[9]

Under the 1996 Act, as a condition for obtaining authority to provide long distance telephone service, ILECs must grant access to their networks to enable CLECs to compete in local exchange markets.[10] Thus CLECs, such as the ABIZ Entities, are able to enter into interconnection agreements with the ILECs, their competitors in the local exchange markets.[11] The FCC and the applicable state agencies that regulate public utilities have established rules and regulations that also govern the terms, conditions, and prices required to be made available under an interconnection agreement.[12]

---

4. 4/17/02 Hearing Transcript at 71 ("Hrg. # 2 Tr.").

5. Adelphia Business Solutions is frequently, if not usually, referred to as "ABIZ." Using a naming convention similar to that used by the Debtors, the Court uses "ABIZ Entities" to refer to both the debtor parent and its debtor and non-debtor subsidiaries, and the expression "Debtors" to refer to those who have actually filed petitions under the Bankruptcy Code.

6. 4/16/02 Hearing Transcript at 106 ("Hrg. # 1 Tr.").

7. *Id.* at 29.

8. *See* Hrg. # 2 Tr. at 71. *See generally* Hrg. # 1 Tr. at 106.

9. *See generally* Hrg. # 1 Tr. at 107–109.

10. *Id.* at 107.

11. *Id.*

12. *Id.*

The Debtors provide their services, primarily to businesses, in three separate ways, each of which implicates the Debtors' relations with the ILECs under their interconnection agreements: [13]

(1) Resale of retail telecommunications services provided by ILEC's—under which CLECs purchase the services from the ILECs at a wholesale rate, and, in turn, resell such services to customers at the retail rate; [14] in this case, CLECs (such as the ABIZ Entities) would normally be *debtors to* the ILECs;

(2) "Type One Services"—where the "last mile" connection to the customer is provided by the CLEC and purchased by an ILEC; [15] in this case, CLECs (such as the ABIZ Entities) would normally be *creditors of* the ILECs; and

(3) "Type Two Services"—the mirror-image of Type One Services—where the "last mile" connection to the customer is provided by the ILEC and purchased by the CLEC; [16] in this case, CLECs (such as the ABIZ Entities) would normally be *debtors to* the ILECs.

Interconnection agreements establish the terms, conditions and pricing under which an ILEC will provide the Debtors with access to the ILEC's network, to enable the Debtors to deliver traffic to the ILEC (so that the ILEC may deliver such traffic to its customers), and vice versa—enabling the Debtors to receive traffic from an ILEC, so that the Debtors may deliver that traffic to the Debtors' customers. The interconnection agreements also provide the Debtors with access to certain of the ILEC's network hardware and facilities that the Debtors may need to provide service to their customers.[17]

Because, in many cases, CLECs and ILECs hand-off traffic to each other, and/or use each other's lines or equipment, they have a broad array of financial obligations running to each other in connection with the equipment or services provided for the other. They include the charges associated with "co-location arrangements," dealing with the point of interconnection for the hand-off of traffic from one to the other,[18] which include construction and build-out charges ("COBO Charges") assessed by the ILECs for the construction of each co-location arrangement.[19] They also include arrangements to provide alternatives to co-location arrangements, including both "special access circuits" to deliver service to end users (although such are relatively expensive) [20] and enhanced extended loops ("EELs"), which are materially cheaper.[21] Each of the ILECs and the CLECs may owe money to the other for use of the other's facilities to reach its end-users—portions that are referred to as "interconnection trunks," for

13. *Id.* at 108.

14. *Id.* at 108–109.

15. *Id.* at 108.

16. *Id.*

17. *Id.* at 108–109.

18. *See id.* at 110–111.

19. *Id.* at 111. The construction of the co-location arrangement is done exclusively by the ILECs. Prior to the initiation of the work to establish the co-location arrangements, the ILECs require the Debtors to pay at least 50% of the COBO Charges. The establishment of each co-location arrangement may cost the Debtors in excess of $50,000, which amount includes COBO Charges and monthly recurring charges, such as lease payments and maintenance fees. *Id.*

20. *Id.* at 112–113.

21. *Id.* at 113.

which the charges are referred to as "trunk billing." [22]

All of these services are billed within the telecommunications community under arrangements that are rather technical and complex. Some are based on the cost of providing the interconnection (e.g., COBO charges), while others are based on fixed rates or minutes—of—use. The charges also depend in substantial part on whether the call carried by the billing entity is a local call (in which case the payment for such is referred to as "reciprocal compensation," billed at a rate of less than a cent per minute of use) or is deemed to be a toll call (in which case the payment for such is referred to as "intercarrier compensation," which is billed at higher rates, of from 1 cent to 2.5 cents per minute of use). [23]

With respect to all or nearly all of the ways by which the ILECs and CLECs charge each other, there are a multitude of ways in which they tend not to agree with each other, especially at the outset, with respect to the amounts that are due. As a result, the interconnection agreements typically have mechanisms for resolving disputes with respect to assertedly inaccurate bills. While the mechanisms are not uniform, they typically provide (at least with respect to the ABIZ Entities and the ILECs here) that:

(a) All undisputed amounts shall be paid by the Debtors and the ILECs within 30 days either of receipt of the bill or of the billing date; [24]

(b) Withheld and disputed amounts must be disputed in writing within the same 30 day period;

(c) Parties must work to resolve such disputes in the ordinary course of business within a finite period, usually 30 to 60 days; and

(d) Senior level management representatives are appointed to settle the matter within the same finite period. [25]

To the extent disputes cannot be resolved, the party seeking payment must seek to enforce its rights through civil litigation or binding arbitration before the applicable regulatory authority. [26]

Litigation or arbitration to recover amounts believed to be due is expensive and sluggish. It may require the Debtors to spend as much as $250,000 for attorneys fees and related costs for each dispute, and may take more than 6 months before the applicable agency renders a decision. [27]

3. *Disputes Between ABIZ Entities and ILECs*

With this by way of backdrop, the ABIZ Entities have experienced a pattern under which their ILECs have withheld payment for all or a portion of their obligations to the ABIZ Entities while requiring the ABIZ Entities to pay their respective obligations in a timely manner. [28] It should be noted that the ILECs, or at least the Objecting Utilities, contend that when they did so, they were acting consistent with their legal rights—a matter which this

---

22. *Id.* at 114–115; *see also* Hrg. # 2 Tr. at 72.

23. Hrg. # 1 Tr. at 116–117, 118–119 (correcting, in part, the proffer at pages 116–117).

24. *Id.* at 119; *see, e.g. id.* at 130, 137–138; Hrg. # 2 Tr. at 135, 144, 152, 220.

25. Hrg. # 1 Tr. at 119–120.

26. *Id.* at 120.

27. *Id.*

28. The Debtors contend that the ILECs' failure to pay the ABIZ Entities amounts due them "is precisely the approach that resulted in the Debtors' cash-starved position and precipitated the commencement of their bankruptcy case and need to obtain DIP financing." Hrg. # 1 Tr. at 33.

Court is not in a position to determine, especially on a motion under section 366. However, whether the failures to pay are justified or not, the ABIZ Entities have outstanding invoices to the four Objecting Utilities—all ILECs—of approximately $213 million, of which approximately $40 million of that is owed to the Debtor entities.[29]

A major portion of this is with respect to the distinction between reciprocal compensation and intercarrier compensation.[30] From the Debtors' perspective, the ILECs seek to classify nearly all of their usage—usage for which they would owe money to the ABIZ Entities—as reciprocal compensation, rather than intercarrier compensation, in order to reduce the amounts they would owe to the ABIZ Entities, when approximately 15–20% of that would actually be intercarrier compensation, for which the ABIZ Entities would be entitled to a much greater amount; the ABIZ Entities believe that the Objecting Utilities are withholding approximately $169 million with respect to unpaid reciprocal and intercarrier compensation.[31]

Other components of the $213 million invoiced by the ABIZ Entities but unpaid by the ILECs include COBO prepayment credits, in excess of $1 million;[32] credits resulting from higher charges arising from delays in converting special access circuits to EELs, in an approximate amount of $2 million;[33] and trunk charge credits in the approximate amount of $44 million.[34]

Once more, the Court emphasizes that while it accepts as true the Debtors' evidence that the ABIZ Entities have unpaid invoices outstanding from the Objecting Utilities of $213 million (and this is a very large amount), the Court is not in a position to find, and does not find, on this record, that such amount, or anything close to it, is indeed legally due and owing—a matter that must be resolved in complex processes that the Court was not in a position to engage in on this motion, and likely would not ever be able to address. The Court does note, however, that if as much as 90% of the ABIZ Entities' invoiced amounts were to turn out to be unfounded, the remaining amount of unpaid charges owing from the Objecting Utilities to the ABIZ Entities would substantially exceed the sum of all of the ABIZ Entities' prepetition debt to the Objecting Utilities and the amounts claimed by the Objecting Utilities for deposits.

That $213 million in unpaid ABIZ Entities' invoices is so large, and significant, to the ABIZ Entities that they have been close to desperate to resolve them. They have offered to mediate the controversies underlying the unpaid invoices, and have even committed to accept "binding mediation." However, the mediation concept—binding or otherwise—was not embraced by the Objecting Utilities.[35]

### 4. Debtors' Financial Condition

When the record at the hearing was made, the ABIZ Entities as a whole—including both debtor and non-debtor subsidiaries—held cash of approximately $12

---

29. *Id.* at 121.

30. Discussed at p. 70 above.

31. Hrg. # 1 Tr. at 117.

32. *Id.* at 112.

33. *Id.* at 114.

34. *Id.* at 115. The ABIZ Entities contend that they consistently timely remits all undisputed trunk billing amounts due to the ILECs, but the ILECs routinely dispute substantially all of the trunk billing amounts due to the ABIZ Entities. *Id.*

35. *See generally, id.* at 89–94.

to $13 million.[36] The Debtors' Vice President of Finance, Edward Babcock, did not know how much of the $12 to $13 million in cash was held by debtor entities, but he acknowledged that the amount would be somewhere less than $12 to $13 million.[37] However, he noted that as a consequence of ABIZ Entities directly or indirectly owning the stock of both the debtor and the non-debtor subsidiaries, the cash would be available to ABIZ Entities to run the enterprise as it sees fit.[38]

On the Commencement Date, the book value of the ABIZ Entities' noncash assets—once more including both debtor and non-debtor entities—was $835 million, after an anticipated impairment charge of $1.2 billion.[39] While there was testimony that the ABIZ Entities had about $2 billion invested in capital and fixed assets,[40] it was not suggested that such a figure, based on historic cost, would be an appropriate measure of real value. Rather, the ABIZ Entities focused on appropriate writedowns from the $2 billion historic cost to formulate an appropriate impairment charge,

and the $2 billion book value of those assets were then written down to correspond to estimated fair value, yielding the $835 million book value for those assets.[41]

### 5.' Postpetition Financing

At the time of the hearing on the motion,[42] the Debtors had obtained commitments for a postpetition financing facility in the aggregate amount of $135 million, with Adelphia Communications Corporation ("ACC") and an entity associated with certain members of the Rigas family— "insiders" of the Debtors by virtue of the common ownership of the Rigas family—as the proposed DIP lenders.[43] Borrowing of a lesser portion of that, $27 million, had been approved on an interim basis.[44] The DIP facility was secured by substantially all of the Debtors' assets. As of the date of the hearing on the motion, the Debtors had not borrowed under the interim financing order.[45]

### 6. Liens on Assets

As just noted, the DIP facility was secured by substantially all of the assets of

---

**36.** Hrg. # 2 Tr. at 124–125, 139 (reflecting correction to proffered testimony of Mr. Babcock at Hrg. # 2 Tr. at 79).

**37.** *Id.* at 139.

**38.** *Id.* at 125.

**39.** *Id.* at 97, 123 (reflecting correction to proffered testimony of Mr. Babcock at Hrg. # 2 Tr. at 81).

**40.** *Id.* at 97.

**41.** *Id.*

**42.** After the hearing on this matter, as was widely reported, the Debtors' DIP lender ACC had well publicized difficulties. The Court was informed in a case status conference that the Debtors were seeking alternative DIP financing. While the Court's knowledge of this circumstance is outside the record on this motion, it would be looking at this situation with blinders, and grossly unfair to the Ob-

jecting Utilities, to disregard this development and proceed as if the facts stated in this section would remain true. Accordingly, as set forth below, the Court's order on this motion will provide for an opportunity for reconsideration to take into account any relevant changes of circumstances, including with respect to the availability of DIP financing.

**43.** Hrg. # 2 Tr. at 79, 90. *See generally* 4/1/02 Hrg.Tr. Even then, the proposed DIP lenders represented that they were more than willing to step aside should the Debtors be able to find a third-party lender to replace them prior to a final hearing on the DIP motion. *See* 4/1/02 Hrg.Tr. at 43–44; *see also* Hrg. # 1 Tr. at 12.

**44.** *See* also, Hrg. # 2 Tr. at 79; Hrg # 1 Tr. at 10. . *See generally* 4/1/02 Hrg.Tr.

**45.** *See* also, Hrg. # 2 Tr. at 79–80; Hr. # 1 Tr. at 10.

the Debtors. As with any secured borrowing facility, however, the DIP lenders' lien would secure only those amounts that had been advanced and were outstanding. With no amounts having been advanced, nothing would be secured; similarly, if amounts were advanced thereafter, the assets would be encumbered to secure repayment, but cash would come in to the estate associated with the indebtedness.[46]

Also, other ABIZ assets—the stock of ABIZ subsidiaries—are subject to liens. The Debtors' most significant secured creditors (referred to in pleadings and transcripts variously as the "12–1/4% Noteholders" or the "12–1/4s," by reason of the interest rate on their underlying notes) are the holders of $250 million (principal amount) in senior secured notes due 2004 (the "12–1/4% Notes"). The 12–1/4% Noteholders have a lien on the stock of certain wholly-owned debtor subsidiaries, but do not have a lien on any of the Debtors' hard assets.[47]

### 7. Cash Flow/Burn Rate

The Debtors estimate their cash burn rate to be $7 to $8 million on a biweekly basis, or about $15 million per month.[48] This amount includes the undisputed postpetition amounts due to the ILECs,[49] but does not include any required deposits.[50]

The ABIZ Entities bill the Objecting Utilities an amount a little under $14 million each month for the services the ABIZ Entities provide the Objecting Utilities. In the same period, the Objecting Utilities bill the ABIZ Entities about $16 million each month. Thus the net outgoing amount with respect to the Objecting Utilities' services is about $2 million each month.[51]

Babcock acknowledged that given the estimated cash burn rate, and putting the DIP aside, it could well be the case that the Debtors would use up their available cash in a matter of a few weeks.[52] He further acknowledged that if DIP financing were not approved, the Debtors would run out of cash and be unable to pay postpetition administrative expenses.[53] Nonetheless, he was confident that even in the absence of DIP financing, the Objecting Utilities would be paid their postpetition payables, by reason of the reciprocal billing for the reciprocal services between

**46.** The Court is aware, of course, that if funds were dissipated in connection with operations, the estate would not necessarily have cash or other liquid (or even illiquid) assets corresponding to the indebtedness secured by a lien. This reality has been considered by the Court in connection with its determination.

**47.** Hrg. # 2 Tr. at 80.

**48.** *Id.*

**49.** *Id.* at 98–99. The Court notes that Mr. Babcock's proffer stated that the burn rate included the undisputed postpetition amounts due to the *"objectors," see id.* at 80 (emphasis added), but on cross-examination, Mr. Babcock's testimony was that the burn rate contemplated payment of Debtors bills to the *ILECs, see id.* at 98–99, which the Court notes

is a broader term that may include the Objecting Utilities, as well as those ILECs that did not object.

**50.** *Id.* at 80.

**51.** *Id.* at 124. These figures exclude AT & T. (*See generally* note 1 above).

**52.** Hrg. # 2 Tr. at 102.

**53.** *Id.* at 103. Since DIP financing provides a means of liquidity and a funding source for the payment of administrative expenses that is far quicker and less uncertain than paying those expenses out of less liquid assets, this underscores importance of DIP financing, and the Court's view, discussed below, that the Objecting Utilities should have the right to seek reconsideration in the event of a change in the availability of DIP financing.

the Debtors and the Objecting Utilities.[54] Though the matter is not wholly free from doubt, the Court finds this as a fact.

### 8. History of Prepetition Payment

The Debtors asserted, in oral argument and in their proffers, that the Debtors paid timely and in good faith the undisputed amounts to the utility and telecommunication companies and have a "solid" prepetition payment history.[55] The Objecting Utilities took issue with this; three of the four Objecting Utilities offered their own proffers in support of their assertions. Ultimately, the evidence with respect to this was inconclusive.

The Court has no difficulty finding that the prepetition indebtedness owing to the Debtors by the Objecting Utilities, and/or owing to the Objecting Utilities by the Debtors, is, in large part, a consequence of the reciprocal nature of the services purchased from and/or sold to the other side, and disputes with respect to the foregoing.[56] The charges invoiced by each party on a monthly basis are the subject of verification and reconciliation, not uncommonly leading to billing disputes between customer and provider. At least in material part as a consequence, the ABIZ Entities determined that they should pay only the portion of the utilities' invoices that the ABIZ Entities regarded as undisputed,[57] and as a result the ABIZ Entities did not in the recent prepetition period pay all of the prepetition charges invoiced to them in a timely way.

Beyond this, however, the Court is not in a position to make findings as to timeliness of prepetition payment. It is difficult, if not impossible, to gauge the ABIZ Entities' timeliness of payment under those circumstances without knowing the merits, and ultimate disposition, of the disputes for which the ABIZ Entities withheld payment.

Certainly, on this record, the Debtors' prepetition history of payment is not sufficiently strong to merit considering it as a factor relevant to whether adequate assurance of payment has been provided, but neither is it so bad that it strengthens the claim of the Objecting Utilities for deposits. For reasons of both the factual uncertainties and the Court's view of this factor as one of those it considers,[58] the Court finds history of prepetition payment to be of minimal relevance.

### 9. Relations With Particular Objecting Utilities

#### (a) BellSouth

BellSouth and the Debtors are party to an interconnection agreement in each of nine states.[59] BellSouth provides approximately $1.2 million of telecommunications services to the Debtors each month.[60] There is a dispute as to the amounts owed

---

**54.** *Id.* at 124.

**55.** Hrg. # 1 Tr. at 39; Hrg. # 2 Tr. at 79.

**56.** *See generally* Hrg. # 1 Tr. at 103–120; Hrg. # 2 Tr. at 72–73.

**57.** *See* Hrg. # 2 at 76, 79.

**58.** As discussed below in the Court's discussion of the applicable law, and factors to be considered on motions of this nature, the Court—while recognizing that prepetition payment history is a factor that traditionally has been considered on section 366 determinations—does not regard past events to be as significant as those relating to a debtor's prospective ability to perform, or to warning mechanisms to permit utilities to keep apprised of a debtor's condition, so utilities may take postpetition measures to protect their interests.

**59.** Hrg. # 1 Tr. at 124.

**60.** *Id.* at 126.

in each direction as of the Commencement Date. From the Debtors' perspective, they owed BellSouth approximately $2.7 million, based on the last outstanding set of invoices issued prior to filing their petitions, of which about $1.1 million was in dispute.[61] From their perspective, that $2.7 million was, however, considerably less than the amount that the Debtors had invoiced to BellSouth.[62] The ABIZ Entities have unpaid invoices outstanding with BellSouth in the approximate amount of $30 million, of which $5.7 million is owed to Debtors, and the ABIZ Entities billed BellSouth an additional $1 million after the Commencement Date, relating to prepetition services that were not included in these figures that would, presumably, increase the amount invoiced to BellSouth.[63]

BellSouth asserted, in its objection, that it owed the ABIZ Entities not more than $910,000;[64] and at a meeting between Debtors and BellSouth, BellSouth then asserted it owed the Debtors nothing, and would not pay the Debtors anything.[65]

BellSouth has been demanding a deposit from the ABIZ Entities for almost a year; the ABIZ Entities have refused such demands based on their view that amounts owing from BellSouth to the ABIZ Entities were well in excess of the requested deposit, and on a concern that BellSouth had delayed efforts by the ABIZ Entities to reduce the ABIZ Entities' cost of service and monthly amounts owed to BellSouth.[66] Notwithstanding that, BellSouth currently holds one deposit, in the amount of $6,000, from the ABIZ Entities.[67]

BellSouth has previously put the ABIZ Entities "on hold."[68] In at least one instance, BellSouth began termination proceedings for nonpayment against one of the ABIZ Entities, though it was a non-debtor entity.[69] BellSouth considers the ABIZ Entities to be a high credit risk.[70]

As is apparent from the foregoing (though this is the tip of the iceberg), there are a multitude of billing disputes between the ABIZ Entities and BellSouth.[71]

### (b) SBC Affiliates

The SBC Affiliates and the ABIZ Entities are party to an interconnection agreement in twelve states; two of the twelve states involve wholly non-debtor entities; Debtors have no operations in another one of the twelve states; and another one of the twelve states involves assets that have been moved to ACC Telecommunications, LLC, a non-debtor, which pays all obligations owing to the SBC Affiliates, leaving no obligations owing from the ABIZ Entities in that state.[72] SBC Affiliates

---

61. *Id.* at 125, 151–152.

62. *Id.* at 125.

63. *Id.* at 127–128; Hrg. # 2 Tr. at 27–31.

64. Hrg. # 1 Tr. at 127; *see generally id.* at 30; BellSouth Obj. ¶ 2. There is a discrepancy, ultimately not relevant to the determination of the motion, between the testimony in this proffer and the Debtors opening remarks and the BellSouth objection with respect to *who* the $910,000 is owed to—whether to the Debtors or ABIZ Entities.

65. Hrg. # 1 Tr. at 172.

66. Hrg. # 1 Tr. at 126–127.

67. Hrg. # 2 Tr. at 188.

68. The term "on hold" means that a customer can no longer place orders, presumably for new services, and existing service is held. *Id.*

69. *Id.*

70. *Id.* at 189.

71. *See, e.g.,* Hrg. # 1 Tr. at 162–170.

72. *Id.* at 131–133; Hrg. # 2 Tr. at 39–40.

provide approximately $900,000 of telecommunications services to the Debtors each month.[73] The Debtors are required to pay for services provided by the SBC Affiliates within 30 days of receipt of a bill. The Debtors routinely pay all undisputed amounts within that period.[74]

As of the Commencement Date, the Debtors owed the SBC Affiliates approximately $2.4 million, which was considerably less than the unpaid amount that the ABIZ Entities had invoiced the SBC Affiliates.[75] Of the $2.4 million, $600,000 is in dispute.[76]

The ABIZ Entities have invoiced, and unpaid amounts due from, SBC Affiliates approximating $14.5 million, of which approximately $1.3 million is owed to Debtors. The SBC Affiliates dispute the majority of the outstanding amounts; the SBC Affiliates acknowledge that they owe the ABIZ Entities something, but there is a dispute as to how much.[77]

### (c) Sprint

The Sprint entities include Sprint Ltd., a provider of local telephone services, and Sprint Communications, L.P. ("Sprint LP"), a provider of long distance and other services (collectively, "Sprint").[78] They filed a joint objection.

Sprint and the Debtors are party to an interconnection agreement in each of five states, pursuant to which Sprint provides local exchange service to the Debtors. Sprint and the Debtors are also party to a master service agreement pursuant to which the Debtors resell Sprint's long distance service.[79] The Debtors are generally required to pay for services provided by Sprint within 30 days of receipt of an invoice or bill. The Debtors routinely pay all undisputed amounts within that period.[80]

As of the Commencement Date, the Debtors had been invoiced by Sprint, but had not paid, approximately $2.6 million.[81] Of the $2.6 million, $200,000 is in dispute.[82]

The ABIZ Entities have outstanding invoices to Sprint in the amount of approximately $17.6 million, of which approximately $200,000 is owed to the Debtors. Sprint has withheld the $17.6 million, and has not acknowledged that it owes any amount to the ABIZ Entities.[83]

The Debtors contend that Sprint provides approximately $1.2 million of telecommunications services to the Debtors each month.[84] Sprint states that based on records for the three months prior to the Commencement Date, the Debtors' average monthly usage of Sprint Ltd. services is approximately $935,000 each month;

73. *Id.* at 134–135.

74. *Id.* at 135.

75. *Id.* at 133–134, 144–145 (reflecting correction to proffered testimony of Ms. Romine at Hrg. # 1 Tr. at 134); Hrg. # 2 Tr. at 33. The $2.4 million does not include amounts owed pursuant to the interconnection agreement that had been assigned to ACC, a non-debtor. Hrg. # 2 Tr. at 57.

76. Hrg. # 1 Tr. at 134; Hrg. # 2 Tr. at 35.

77. Hrg. # 1 Tr. at 135–136; Hrg. # 2 Tr. at 60.

78. Hrg. # 2 Tr. at 141–142, 151.

79. Hrg. # 1 Tr. at 128.

80. *Id.* at 130.

81. *Id.* at 144, 148 (reflecting correction of proffered testimony of Ms. Romine at Hrg. # 1 Tr. 129).

82. *Id.* at 129, 148.

83. *Id.* at 130–131.

84. *Id.* at 129–130.

from that, Sprint Ltd. predicts the expected average postpetition usage will be $218,166 each week, or $935,000 each month.[85] Based on records for the same period, the Debtors' average monthly usage of Sprint LP services is approximately $2.2 million each month; from that Sprint LP predicts the expected average postpetition usage will be $511,628 each week, or $2.2 million each month.[86]

Sprint LP alleges that as of the Commencement Date, Debtors were past due in payment to Sprint LP in the amount of $3,551,878; of that, approximately $840,000 was in dispute.[87] Prior to the Commencement Date, Sprint LP placed a credit hold on the Debtors.[88]

*(d) Verizon*

Verizon and Debtors are party to interconnection agreements in approximately 22 states and the District of Columbia.[89] The Debtors are generally required to pay the services provided by Verizon within 30 days, though there is a dispute as to whether this runs from billing or receipt.[90] The Debtors routinely pay all undisputed amounts within such period.[91]

As of the Commencement Date, the Debtors contend they owed Verizon approximately $5.9 million, of which $2.1 million was in dispute.[92] Verizon contends that as of the Commencement Date, the Debtors—as best as Verizon could identify from the ABIZ Entities as a whole—owed Verizon approximately $7,508,087 for services, some of which was in dispute.[93]

The ABIZ Entities have invoiced Verizon, but Verizon has not paid, for approximately $144.7 million of ABIZ Entities' services, of which approximately $31.8 million is owed to Debtors. Verizon has disputed the majority of all amounts that the Debtors allege to be outstanding.[94] The ABIZ Entities provide approximately $10 to $17 million of service to Verizon on a monthly basis.[95] As of the Commencement Date, Verizon contends it owed the Debtors—as best as Verizon could identify from the ABIZ Entities as a whole—$2,920,404.[96] Verizon states that therefore the Debtors owed Verizon a net amount of $4,587,682.[97]

With respect to the ABIZ Entities' contention that Verizon owes the ABIZ Entities a much larger sum—$147.7 million, Verizon contends that there is a dispositive ruling from the FCC that such charges may not lawfully be imposed by ABIZ.[98] Based on its position with respect to that FCC ruling and Verizon's records, Verizon believes that the vast bulk of the prepetition amounts claimed by the ABIZ Entities are not in fact owed to the ABIZ

85. Hrg. # 2 Tr. at 142–143.

86. *Id.* at 152.

87. *Id.* at 161.

88. *Id.* at 154.

89. Hrg. # 1 Tr. at 136, 144 (reflecting correction to proffered testimony of Ms. Romine at Hrg. # 1 Tr. at 136). The interconnection agreements in those states may also include non-debtor entities. *See id.* at 184–187.

90. *Id.* at 137–138, 175; *see* Hrg. # 2 at 219–220.

91. Hrg. # 1 Tr. at 138.

92. *Id.* at 137.

93. Hrg. # 2 Tr. at 212–213, 215; Verizon Exh. 1.

94. Hrg. # 1 Tr. at 138.

95. *See id.* at 191.

96. Hrg. # 2 Tr. at 213–214; Verizon Exh. 1.

97. *Id.* at 214; Verizon Exh. 1.

98. *Id.* at 229–230, 232.

Entities, and the only amount Verizon owes to the Debtors is $2,920,404.[99]

Debtors contend that based on the last outstanding invoices prior to the Commencement Date, Verizon provides approximately $1.3 million of telecommunications services to the Debtors each month,[100] though historically there have been month-to-month variations in the amount of service.[101] Verizon contends that, with limited exceptions (in New England), separate Verizon subsidiaries provide the services in each jurisdiction. There are currently approximately 580 separate Verizon accounts open with the ABIZ Entities, many of which are with Debtors. The date of billing varies from account to account, and date payment is due varies from account to account.[102] In those jurisdictions identified as involving Debtors, Verizon contends it provides an average gross total of $3,384,000 of service to Debtors. Assuming an offset to that amount of the average amount of services Debtors provide Verizon, Verizon states the average net amount is owing from Debtors to Verizon in the approximate amount of $2,045,000 each month.[103]

Verizon typically cannot, or at least does not, offset amounts owed by Verizon to the ABIZ Entities, or owed by the ABIZ Entities to Verizon. At the least, Verizon does not do so across accounts. Rather, Verizon pays undisputed amounts owed on any one account to the ABIZ Entities, even if the ABIZ Entities owe sums to Verizon.[104]

### 10. Objecting Utilities' Competition With Debtors

The relationships with the ILECs are such that the ILECs are not only vendors of services to the Debtors, and consumers of services from the Debtors; they are also competitors of the Debtors.[105] For example, the ILECs provide the Debtors with the ability to sell services, such as telephone services, that are also provided by the ILECs. With respect to the resale services described above, the Debtors purchase the services at the wholesale rate and resell them to customer at the retail rate; if the Debtors were not acting as a middleman, the ILECs could provide those services to customers at the retail rate themselves, and thereby gain the spread between wholesale and retail prices. The ILECs would also stand to capture many of the ABIZ Entities' customers should the ABIZ Entities fail.[106]

Thus, while the ILECs have an interest in receiving payment for the services they provide, they also have an interest in eliminating unwanted competition. While the Court cannot find, on this record, that the ILECs have in fact demanded deposits in the amounts sought, or intentionally withheld payment to the ABIZ Entities, to drive the ABIZ Entities out of business, the Court can and does find that the ILECs' additional interest as competitors, and in eliminating unwanted competition, distinguishes them from the utilities in

---

**99.** *Id.* at 229–230.

**100.** Hrg. # 1 Tr. at 137, 181.

**101.** *Id.* at 183.

**102.** Hrg. # 2 Tr. at 208–209.

**103.** *Id.* at 224–226.

**104.** *Id.* at 209–210.

**105.** Hrg. # 1 Tr. at 109.

**106.** *Id.* at 109–110. While it is unclear to the Court whether Sprint Ltd. properly should be considered to be an ILEC, the Court notes, and accepts, the testimony that at least one group at Sprint Ltd. does not consider CLECs to be adversaries, as the CLECs are the only source of revenue for that group. Hrg. # 2 Tr. at 147.

most other section 366 disputes, where the utility would benefit from the debtor's successful reorganization, and simply wants comfort that it will be paid.

### 11. Other Matters

The Debtors have noted that to the extent that any utility is not paid its postpetition charges on a current basis, it is entitled to an administrative expense priority under 503(b), and this of course is true. The utilities argue that they would be entitled to administrative expense status for their postpetition services whether or not such was specially awarded as a means of ensuring adequate assurance of future performance to the utilities, and this of course is also true.

The failure of the Objecting Utilities to timely remit payment to the Debtors, whether justified or not, has played a primary role in precipitating the commencement of these cases and has required the Debtors to seek DIP financing.[107] The Debtors have made a showing sufficient for the Court to find (for the purposes of this motion only), that the ILECs require Debtors pay the undisputed portion of the ILECs invoices, but the ILECs either do not remit payment to the Debtors pursuant to the Debtors' invoices until resolution of all disputed portions, or pay a de minimis portion.[108] Without ruling on the propriety of the ILECs' actions in this regard, the Court finds that this has a tremendously adverse impact on ABIZ's cash flow.[109]

The Debtors have made a showing, and the Court finds, that the ILECs' proposal for adequate assurance in the form of ac-

celerated billing terms or prepayment of invoices would adversely affect the Debtors' cash flows.[110] The ABIZ Entities bill their customers on a monthly billing cycle. Accelerated payment schedules, and/or prepayment of invoices, would force the Debtors to borrow under the DIP facility, at the price of increased interest expense and decreased DIP facility availability for other purposes, because the revenues from ABIZ customers would not yet be received by the time Debtors had to pay the ILEC invoices.[111] Accelerated payment procedures or prepayment procedures could also be expected to lead to even more disputes with respect to reconciliation or true-ups of amounts owed.[112]

### Discussion

#### Matters Relevant to the Determination

Section 366(a) of the Bankruptcy Code provides:

(a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

■■■ Section 366(b) then goes on to provide:

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes *adequate assurance* of payment, in the form of a deposit or other security, for service after such date.

---

107. Hrg. # 2 Tr. at 74–75.

108. *Id.* at 76.

109. *Id.*

110. *See id.* at 78.

111. *See id.*

112. *Id.* at 78–79.

80

(Emphasis added). The requirement is for "adequate assurance" of payment, which, at least in this Circuit, need not necessarily be provided by deposit. *See Virginia Elec. & Power Co. v. Caldor, Inc.,* 117 F.3d 646, 650–651 (2d Cir.1997) ("*Caldor*"), *aff'g* 199 B.R. 1, 3 (S.D.N.Y.1996) (Stein, D.J.) ("*Caldor–District* ").[113] Whether utilities have adequate assurance of future payment is determined by the individual circumstances of each case. *See Massachusetts Elec. Co. v. Keydata Corp. (In re Keydata Corp.),* 12 B.R. 156, 158 (1st Cir. BAP 1981) ("*Keydata* "); *In re Utica Floor Maintenance, Inc.,* 25 B.R. 1010, 1016 (N.D.N.Y.1982).

■ "Adequate assurance" under section 366 should not be confused with "adequate protection" under section 361. In determining adequate assurance, a bankruptcy court is not required to give a utility company the equivalent of a guaranty of payment, but must only determine that the utility is not subject to an unreasonable risk of nonpayment for postpetition services. *See Caldor–District,* 199 B.R. at 3 ("The statute does not require an 'absolute guarantee of payment' "); *Keydata,* 12 B.R. at 158 ("In our view, 'adequate assurance of payment' does not require an absolute guarantee of payment. What is required is that the utility be protected from an *unreasonable* risk of nonpayment") (emphasis added).

■ It also has been held that when making decisions as to what constitutes

"adequate assurance" under section 366(b), bankruptcy courts are not bound by local or state tariff regulations. As the district court, later affirmed by the Third Circuit, held in *Begley v. Philadelphia Elec. Co. (In re Begley),* 41 B.R. 402 (E.D.Pa.1984), *aff'd,* 760 F.2d 46 (3d Cir.1985):

> The bankruptcy courts are in agreement that section 366(b) vests in the bankruptcy court the exclusive responsibility for determining the appropriate security which a debtor must provide to his utilities to preclude termination of service for non-payment of pre-petition utility bills.... Thus, a state regulation prescribing a particular security deposit does not bind the bankruptcy court.

41 B.R. at 405–406 (citations omitted). Thus, points that deposits should be directed because they are provided for by state tariff[114] fail appropriately to address the analysis that a bankruptcy court must make on this federal question. Rather, debtors and utilities must address the federal caselaw standards for determining whether adequate assurance has been provided, and, in particular, the extent to which the utilities have been subjected to an unreasonable risk of nonpayment.

■ In the Second Circuit, at least, determinations of that nature are within the discretion of the bankruptcy court. As the Second Circuit held in *Caldor,* which all of the Objecting Utilities who have spoken to the issue[115] agree sets forth standards that must be applied:

---

113. *Caldor–District* affirmed, in turn, the decision the bankruptcy court, a decision announced by Judge Garrity from the bench ("*Caldor–Bankruptcy* ").

114. *See* BellSouth Obj. ¶ 44 & n. 1 (BellSouth's deposit request is also supported by "tariffs governing the provision of services by BellSouth to the Adelphia Debtors"; referring the Court to the internet location where they

can be found; and offering to provide hard copies of the tariffs on request).

115. *See, e.g.,* BellSouth Obj. ¶ 6 ("There is no dispute that the controlling case on point for Section 366 adequate assurance issues in this Court is *Caldor* "); SBC Affiliates Obj. ¶ 12 ("the Debtors have failed to [meet] the criteria set forth in *In re Caldor* ") (typographical error corrected); Verizon Obj. ¶ 15 ("The Debtors ignore several distinctions between *Caldor*

Bankruptcy courts are properly afforded significant discretion in the exercise of their duties. We have observed that "in bankruptcy proceedings substance should not give way to form," and "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code." *In re Financial News Network Inc.*, 980 F.2d 165, 169 (2d Cir.1992) (internal quotation marks omitted) (alteration in original). In deciding what constitutes "adequate assurance" in a given case, a bankruptcy court must "focus upon the need of the utility for assurance, and to require that the debtor supply *no more than that*, since the debtor almost perforce has a conflicting need to conserve scarce financial resources." Accordingly, "bankruptcy courts must be afforded reasonable discretion in determining what constitutes 'adequate assurance' of payment for continuing utility services."

117 F.3d at 650 (emphasis in original; two citations omitted).

While BellSouth and Verizon cited caselaw from other districts, and principally from other circuits,[116] seemingly suggesting that the Court should require deposits almost as a matter of course, there was a notable failure on their part to show, or even argue, that such had been required in this Circuit, where *Caldor* is binding authority. At the least, the Second Circuit in *Caldor* did not disapprove of Judge Stein's analysis that a bundle of protections, including "safeguards provided by the bankruptcy court," *see* 117 F.3d at 649, can constitute "other security." *Id.* at 650.[117] The Second Circuit went on to say that the authority of a bankruptcy court, under section 366(b), to "modify" the level of the "deposit or other security" included the power to require *no* "deposit or other security" where none was necessary. *Id.* Thus the Second Circuit held in *Caldor:*

> We conclude that—whether because the phrase "other security" is read to include safeguards that are otherwise

---

and the case at bar"). Oddly, Sprint fails to address *Caldor* at all.

**116.** *See* BellSouth Obj. ¶¶ 38–40; Verizon Obj. ¶¶ 13–14. No case cited by either of them was from this district, and one of the two decisions from a district in this Circuit, *In re Norsal Indus., Inc.*, 147 B.R. 85 (Bankr. E.D.N.Y.1992), preceded *Caldor* by five years. The other, *In re Spencer*, 218 B.R. 290 (Bankr. W.D.N.Y.1998), involved dramatically different facts, a husband and wife in a chapter 13 case. *See id.* at 291 (noting that the issue typically comes up in chapter 11 cases, and that "seldom is such a request made when the debtor is a residential customer"). In this post-*Caldor* decision, Chief Judge Ninfo noted the exact principles applied by the Court here:

> From various decisions within the Second Circuit, we know that: (1) bankruptcy courts must be afforded reasonable discretion in determining what constitutes adequate assurance of payment for continuing utility services ...; (2) in deciding what constitutes adequate assurance of payment,

a bankruptcy court must focus upon the need of the utility for assurance, and to require that the debtor supply no more than that ...; (3) the term "other security" in Section 366(b) may include other safeguards provided by the bankruptcy court ...; and (4) what constitutes adequate assurance of payment is a factual question to be resolved on a case-by-case basis, and is not necessarily equivalent to a deposit approved or required by a state regulatory commission.

*Id.* at 293 (citations, including citations to *Caldor* and *Caldor–District,* omitted).

**117.** It there stated:

> In any event, we need not decide whether ... the term ["other security"] is best read more broadly, as the district court did, to encompass any form of safeguard that a bankruptcy court determines would help to assure a utility supplier of continued payment.

117 F.3d at 650.

available to a utility supplier under the Bankruptcy Code, or because a bankruptcy court has the authority to require *no* "deposit or other security" at all—the bankruptcy court need not require some additional safeguard where it determines that safeguards otherwise available under the Code provide the "adequate assurance of payment" with which § 366(b) is ultimately concerned.

*Id.* at 651. And it concluded:

> To summarize: we reject the Utilities' contention that the safeguards put into place to provide them with "adequate assurance of payment" fail as a matter of law to meet the requirements of § 366(b). We reach this conclusion even if we assume, as the Utilities urge, that these safeguards were otherwise available to Caldor's utility suppliers in the normal course.

*Id.* at 652.

Thus the Second Circuit in *Caldor* rejected the notion of mandatory deposits in no uncertain terms. Given that, the Court does not believe that it can appropriately rely on contrary authority from outside the Second Circuit.

■ Courts for whom *Caldor* is binding authority engage in the fact-driven analysis required under the language quoted above, balancing the need to protect utilities from unreasonable risk of nonpayment with the loss of debtor liquidity that would be occasioned by a mechanical imposition of requirements for deposits. That calls for a particularized inquiry into the postpetition economics of a debtor's chapter 11 case, to make an informed judgment as to the degree of comfort that utilities will be paid for their postpetition charges.

In making that determination, this Court has assistance not just from *Caldor*, but from the decisions below that led up to it. Examining the particular circumstances in *Caldor–District*, Judge Stein of the district court noted the particular facts that had informed the decision of Judge Garrity of the bankruptcy court (whom Judge Stein affirmed) not to require security deposits there: (1) the Debtors had significant cash on hand and access to over $500 million in financing; (2) the Debtors posed significantly less risk than other customers of the Utilities; (3) the Utilities had a greater ability to monitor the financial strength of the Debtors; (4) the Debtors were solvent [118] and were operating out of the proceeds of their operations; (5) the Debtors had a solid prepetition payment history; and (6) the Utilities generally had not required deposits from the Debtors in the past.[119] Based on these findings, Judge Garrity had determined that the only security necessary to provide "adequate assurance" to the Utilities was (1) granting the Utilities an administrative priority; (2) creating a streamlined procedure for the Utilities to obtain immediate relief and future security if the Debtors were late on a single payment; and (3) requiring the Debtors to provide certain financial reports on a monthly basis to the Utilities. *See Caldor*, 117 F.3d at 647.

■ While this Court can go through those factors, and does so below, it believes that the inquiry should be neither a counting analysis nor a mechanical checking off of factors. Rather, the heart of the

---

118. The meaning of "solvent," as used in one of the factual findings in *Caldor–Bankruptcy* (noted in *Caldor–District, see* 199 B.R. at 2), is unclear, even after the Court asked counsel at argument in this proceeding. *See* Hrg. # 1 Tr. at 36–37. The Court's understanding, with which nobody differed, was "not administratively insolvent," rather than "solvent" in the sense that all of the debtor Caldor's pre— and post-petition debts could be paid in full.

119. *See Caldor–District*, 199 B.R. at 2.

inquiry, as engaged in by each of Judge Stein and the Second Circuit, is the examination of the totality of the circumstances to make an informed judgment as to whether or not the utilities would be subject to an unreasonable risk of payment. This Court believes, in that connection, that in determinations of that character, factors such as available financial resources—liquid assets, other assets, and borrowing capability—take on a greater importance, as do measures to provide early warning in the event of negative operating results, and quick access to the Court to help the utilities minimize their risk. In this Court's view, indicators that are merely historical—such as prepetition payment history, and whether the utilities demanded deposits in the past—have lesser relevance.

Considerations of that character were the underpinnings for this Court's decision in *In re Global Crossing, Ltd.*, No. 02–40188(REG), a case in which deposits totaling $155 million had been requested by approximately 200 utilities. The decision, which was read off the bench but not reported,[120] declined to require deposits or like measures that would deprive Global Crossing of the liquidity it needed, after reviewing the facts to measure the risks to which the utilities were subjected, and imposing conditions to reduce their risk. The Court there considered the debtor Global Crossing's liquidity; its cash "burn" rate; the extent to which it had assets which, while illiquid, nevertheless had value; the extent to which its assets were subject to liens that would come ahead of administrative expenses, and a variety of conditions (ultimately ten in number) that the Court imposed to give utilities a "distant early warning" of matters of financial concern; expedited access to the Court; and the opportunity for reconsideration of the adequate assurance order in the event of a material adverse change in liquidity. These measures, particularly in the aggregate, would help gauge the risk of an administrative insolvency, and an inability to meet obligations to the utilities for their postpetition services. They would also help minimize the risk to utilities should administrative insolvency occur.

 When considering the totality of the circumstances in telecommunications company cases, additional factors may sometimes appear; they plainly appear here. It appears to be not uncommon in such cases that, as here and in *Global Crossing*, telecommunications companies owe amounts to each other. When that happens, as this case shows, there is a significant probability that they will not agree with each other in material respects with respect to the amount that is owed in one direction or another. Under the totality of circumstances analysis used in these cases, it would be approaching the facts with blinders to disregard those facts, and to consider the fact that a debtor owes sums to its telecommunications providers without also taking into account the sums those providers owe to the debtor.[121] In

**120.** The resulting order appears on the Court's ECF System. *See In re Global Crossing, Ltd.*, No. 02–40188–reg (Order dated Mar. 15, 2002, Docket # 655). The order was not appealed. The Court believes that the transcript of the Court's decision as announced the day after the hearing, on February 21, 2002, is publicly available. The Debtors' counsel here was also the debtors' counsel there, and all four of the Objecting Utilities were likewise objectors in that case; they addressed *Global Crossing* in varying degrees in oral argument.

**121.** It also would be approaching the facts with blinders to disregard the fact that the utilities here—unlike those in most cases—are not just vendors to the Debtors, but also competitors. However, other than having a concern that it should be slow to order deposits that would put any entity (and especially a competitor) out of business, the Court has not

this case, for instance, the amount invoiced by the ABIZ Entities to the Objecting Utilities dwarfs the amount claimed by the Objecting Utilities for deposits, yet the Objecting Utilities dispute that the amounts invoiced by the ABIZ Entities fairly represent the amounts those Objecting Utilities owe.

But bankruptcy courts are faced with a practical problem. Motions under section 366—which need to be resolved as quickly as practicable to permit parties to act in accordance with the Court's decision—are ill-suited to making the determinations on the merits of major contractual disputes of almost any kind, much less those of the complexity of those here, which the Court has described above in only the most simplistic terms. That is the teaching of the Second Circuit's decision in *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir.1993). Dealing with another contested matter, there a motion to assume under Bankruptcy Code section 365, the *Orion* court reversed a decision of the bankruptcy court that had entertained a dispute as to the contractual rights of the debtor and its contract counterparty incident to the bankruptcy court's determination under section 365. The *Orion* court held:

> The bankruptcy court erred because it misapprehended the fundamental nature and purpose of a motion to assume. At heart, a motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues. *Cf. In re Docktor Pet Ctr., Inc.*, 144 B.R. 14, 16 (Bankr.

D.Mass.1992) ("[A] motion to assume an executory contract is generally, and should be, a summary proceeding. It is not the place for an extended breach of contract suit").

4 F.3d at 1098–1099.

While the motion to assume under section 365 before the court in *Orion* and the motion for determination of adequate assurance under section 366 here plainly involve different sections of the Code, they share the common characteristic of the need for determination in "real time," without the ability to try the merits of contractual disputes of the nature presented here, which are in substance "an extended breach of contract suit." Necessarily, then, the Court has to avoid considering the dispute with blinders, on the one hand, yet be as fair as possible to the two sides, on the other.

The Court believes that in exercising their discretion on Section 366 determinations of this nature, bankruptcy courts can best achieve the statutory objective by attempting to gauge the bona fides and materiality of debtor contentions that a utility has debts running back to the debtor, but without determining the complex disputes between a debtor and its counterparties with respect to the amounts each owes to the other, or accepting one or another side's *ipse dixit* assertions with respect to the merits of the parties' disputes. Utilities' legitimate needs and concerns in this regard can be satisfactorily addressed by permitting and encouraging the parties to proceed with an expedited resolution of their disputes with each other, and by making this Court's adequate assurance determinations without prejudice to expedited reconsideration after is-

needed to place any material reliance on this fact.

sues with respect to the underlying disputes have been resolved.[122]

### Application to the Facts Here

 In laying out contentions on what was appropriate to provide adequate assurance, the Debtors and most of the Objecting Utilities took fairly extreme positions, neither of which was particularly sensitive to the balancing that *Caldor* and *Global Crossing* require. The Debtors proposed that the availability of an administrative expense priority under Bankruptcy Code section 503(b), in the context of their prepetition history of payment, was sufficient to provide the required adequate assurance.[123] At the other extreme, three of the four Objecting Utilities demanded deposits, prepayment, or both.[124] In the Court's view, each of those extreme approaches gave undue deference to the proponent's desires, without sufficient regard to the needs and concerns of the opposing side.

Each of the parties can make some points with respect to similarities and differences between this case and *Caldor*, for the factors here and there are an imperfect match. One, available cash, is uncertain (as the amount of Caldor's available cash was not stated in the reported decisions), but the Court believes that there is at least a risk that here this factor is weaker, when available cash is compared to monthly utility charges; however another factor, available accounts receivable, discussed above and below, is stronger.

Other factors are similar, such as the presence here, as there, of a DIP facility (with a lien on Debtors' assets, but repre-

---

122. A few others points made by the Objecting Utilities warrant brief mention. Some have referred to a portion of *Caldor* where the Second Circuit stated:

That "adequate assurance of payment" might in certain, exceptional cases require nothing more than what the Code already provides, does not render unnecessary or superfluous § 366(b)'s provision that there be "adequate assurance" in all cases—a provision that may indeed require something more in other (if not most) circumstances.

117 F.3d at 652. The Objecting Utilities use this to argue that it would be the rare case where an administrative priority would be sufficient to provide adequate assurance of future payment. The Objecting Utilities may well be right in that regard, but while the Debtors made an argument that an administrative priority would suffice under the facts of this case, the Court, as described below, does not subscribe to that view.

Then, BellSouth and Verizon have referred to legislation pending in Congress that would have the effect, if not the purpose, of legislatively overruling *Caldor*, and imposing a per se rule that would require deposits or their equivalent. But the fact that utilities, like certain others, have secured benefits in the proposed legislation that would advantage them over other creditors—and the fact that if this legislation were enacted, it would change the law—underscores, rather than contradicts, the position urged by the Debtors and their other creditors now. Until and unless such legislation has been duly enacted, this Court's constitutional duty isto comply with the existing law.

123. *See* Motion ¶ 11.

124. *See* BellSouth Obj. ¶ 44–46 (seeking $5 million deposit, or, alternatively, prepayments and setoff rights); Sprint Obj. ¶ 10 (demanding $6 million deposit and, under certain circumstances, weekly prepayment of charges); Verizon Obj. ¶ 3 (seeking a month's deposit, and twice-monthly prepayments). The fourth, the SBC Affiliates, focused on this Court's earlier decision on the section 366 motion in *Global Crossing* (discussed above and below), which raised many of the same issues. Having noted that in *Global Crossing*, deposits were not directed but numerous protective conditions were imposed, the SBC Affiliates sought, in lieu of a deposit, similar protective conditions here. As is apparent from the discussion that follows, the SBC Affiliates properly anticipated the Court's thinking in this regard.

senting a claim on those assets only to the extent of money advanced and outstanding under the DIP facility, which, at least at the outset, would be matched by cash coming in),[125] and the financial strength of the Debtors, relative to other customers (where the Debtors are obviously in chapter 11, but, as a consequence, are free from the duty to satisfy a huge number of unsecured prepetition claims against their asset base). Still another, negative cash flow, is one where the Debtors here compare less favorably.[126]

Another factor, the safeguards that the Court will impose, is considerably stronger here than in *Caldor*—representing about three times as many protective safeguards—and, indeed, some of the safeguards have been crafted to address weaknesses previously discussed.

And another factor is present here—one which had no counterpart in *Caldor*—the $213 million in receivables invoiced by the ABIZ Entities to the Objecting Utilities. As noted above, the Court has *not* found that such is actually owing, or anything remotely near that in amount. But the Court recognizes that if even as much as 90% of that were not due and owing to the Debtors, the remaining 10% would nevertheless materially exceed the amount claimed in deposits by the Objecting Utilities. Until any utility in question, after resolution of the amounts in controversy,

shows the Court that even that 10% is not due and owing, the Court considers that fairness to the Debtors and their other creditors requires an interim determination that this factor strongly weighs in favor of finding the requisite adequate assurance.[127]

Comparing this case to what this Court considers to be the other meaningful precedent—*Global Crossing*—is likewise helpful, though the similarities, while considerable, are not perfect. The debtors in *Global Crossing,* also a telecommunications provider, likewise had negative cash flow, and had greater cash burn, but with a considerably greater amount of cash to start with, and with an enterprise value, which then could be judged, in rough terms, by a bid for its business that was outstanding at the time, of over $1 billion. The *Global Crossing* debtors did not have a DIP financing facility, but did have secured debt, of a size where their secured lenders more likely than not would be undersecured. They likewise had debts running in both directions with their telecommunications providers, though nonpayment of their receivables was not as much of a factor as here, at least insofar as the issues were argued. Conditions were imposed in *Global Crossing* to give the utility providers the "distant early warning" and means to minimize their exposure de-

---

**125.** Once more, the Court notes that facts in this respect may have changed since the hearing, and, as noted below, this determination is without prejudice to reconsideration in the event of material changes in the facts; a change with respect to the availability of DIP financing would be a classic example.

**126.** For the reasons noted above, this Court considers prepetition payment history and prepetition requests (or non-requests) for deposits to be of minimal relevance.

**127.** While the Court here is trying only to act consistently with the caselaw requiring con-

sideration of the totality of the facts, and has not accepted the Debtors' contention that the utilities are responsible for a failure to fix the amounts owed, the Court does note that if any utility believes that the Court's determination based on the parties' limited showings unduly gives weight to the Debtor's view of the world, the utility will have an incentive to mediate, arbitrate, or litigate the underlying disputes to fix the amounts owed, establishing a basis upon which the Court can make a determination with more precisely determined facts.

scribed above and below, upon which conditions here have been modeled, and which thus present a basis for very substantial similarity.

But while the Court has considered the factors considered in *Caldor* and *Global Crossing,* and finds them relevant to the extent noted, the Court believes that a mechanical ticking off of the factors that were considered in those cases is not fully responsive to the analysis that Judge Stein and the Second Circuit later provided. In affirming the decision of Bankruptcy Judge Garrity, District Judge Stein noted that:

> Section 366(b) requires the Bankruptcy Court to determine whether the circumstances are sufficient to provide a utility with "adequate assurance" of payment.

*Caldor–District,* 199 B.R. at 3.

That, the Court believes, is the key to the analysis—to look at the totality of the circumstances to see the extent to which utilities are subjected to unreasonable risk of payment. The Court believes it to be appropriate, as Judge Stein did at the district court level before he was affirmed by the Second Circuit in *Caldor,* to look at the totality of the circumstances to compare the bundle of circumstances that would determine whether or not utilities are subjected to unreasonable risk of non-payment. In this Court's view, it is not a deposit, or an administrative expense claim, or any other single thing that is necessary to give the Court comfort that the utilities will be paid; it is all of them together.

Here the Court finds, as mixed questions of fact and law, based on the record developed at the hearing, that the combination of:

i. Cash on hand of $12 to $13 million;

ii. The presence of a DIP facility,

iii. Section 503(b) priority;

iv. Invoices outstanding from the Objecting Utilities of $213 million, 10 times the amount expected to accrue to the Objecting Utilities over the next two months;

v. The opportunity to seek prompt reconsideration of this determination in the event of a determination of the amounts due from the Objecting Utilities to the ABIZ Entities, and vice-versa;

vi. The reporting requirements, discussed below, that the Court will impose as conditions;

vii. The expedited relief provisions, discussed below, that the Court will impose as conditions;

viii. The dispute resolution provisions, discussed below, that the Court will impose as conditions; and

ix. The Adverse Change Right of Review rights, discussed below, that the Court will impose as conditions;

collectively cause the Court to conclude and find, as a mixed question of fact and law, that utilities have "other security" and adequate assurance of future payment at least in the next several months, subject to the right of utilities, discussed below, to require the Debtors to renew their showing as to adequate assurance of payment in the event of an adverse change in the Debtors' circumstances.

### *Conditions*

Incident to its determination in this regard, however, the Court considers it appropriate to put into place safeguards similar to those put into place in *Global Crossing,* and more extensive than those required in *Caldor:*

First, of course, all utilities will have administrative expense status under section 503(b).

Second, for each of the four Objecting Utilities—Verizon, BellSouth, the SBC Affiliates, and Sprint—the Debtors will be required, as a condition to the benefits secured under this Order, to timely pay the portion of each invoice that in good faith is not disputed.

Third, the Court will both take into account the results of any mechanism developed to resolve the disputes between the ABIZ Entities and the Objecting Utilities as to amounts allegedly owed to the ABIZ Entities, and vice-versa. The Objecting Utilities may come back to this Court for reconsideration of the determinations made here in the event of material progress in determining whether, and to what extent, the Objecting Utilities do indeed have, as shown in non-conclusive testimony here, debts owing to the ABIZ Entities.

Fourth, the Court will require expedited procedures to deal with postpetition payment defaults. In the event of a payment default, a utility can fax notice to the Debtors, with a copy to the Debtors' counsel, and if payment of the undisputed portion is not made by wire transfer or similar good federal funds within 3 business days thereafter, the utility will be able to seek, by Order to Show Case, an order requiring immediate payment, with objections returnable as little as two business days thereafter.

Fifth, the Debtors will provide to any Objecting Utility who requests it, by itself or by its counsel, copies of their monthly operating statements on the same day that each statement is filed with the Court, or the day such are provided to the U.S. Trustee if that comes earlier.[128]

Sixth, the Court will require that the Debtors provide the Objecting Utilities with weekly flash reports with respect to their available cash and DIP financing availability, subject to reasonable confidentiality restrictions that balance the needs of utilities to act on what they learn and any needs of the Debtors or their other creditors to avoid the disclosure of sensitive information. The Court recognizes the substantial hardship that would be suffered by the Debtors (and more importantly, their creditors) if the Court were to require deposits or the equivalent, particularly of the enormous size requested here, which would in substance use up all of the Debtors' available cash. But addressing the needs of the utilities, in the Court's view, here requires establishing a kind of "Distant Early Warning System" to avoid prejudice to them. To minimize the burden on the Debtors, the Objecting Utilities will designate one of their number as a liaison to receive the reports from the Debtors, and the liaison will be the only one authorized to call the Debtors' personnel with respect to questions.

Seventh, in the event of any dispute with respect to payment of any bill or balance going in either direction, the Court will

---

128. Concurring in *Caldor,* Judge Meskill stated in this connection:

I do so on the narrow ground that the term "other security" includes, at a minimum, the requirement imposed by the bankruptcy court that Caldor provide the Utilities with copies of Caldor's monthly operating statements promptly after Caldor files the statements with the bankruptcy court. Although the Utilities contend that this measure cannot constitute security because the statements were otherwise available to the Utili-

ties, the bankruptcy court's order provides the Utilities with prompt and inexpensive access to the statements, something the Utilities did not have before the bankruptcy court's order. Further, the statements provide the Utilities with "security," as that term is commonly understood, because the Utilities will be kept well informed of Caldor's financial condition and will be able to protect themselves should Caldor's financial situation worsen.

117 F.3d at 652.

hear such dispute, by motion (as contrasted to adversary proceeding), on 10 days notice, unless a longer time for presentations is jointly agreed upon.[129]

Eighth, the Debtors and each utility that has sought adequate assurance of payment will exchange with each other names, addresses, phone numbers, and fax numbers of people with appropriate authority to deal with late or missed payments, or failures appropriately to credit past payments—bypassing lock boxes, processing agencies and computers.

Ninth and last, but hardly last in importance, the matters in this order will be revisited in the event of a material adverse change in the liquidity of the Debtors, as evidenced by the required reports or otherwise; by a default by the Debtors under the Debtors' DIP financing facility, or after other circumstances indicating that the DIP financing facility would not be available; or in the light of a new DIP financing facility which is materially less favorable to the Debtors.[130] While the right to come back to the Court should not be regarded as a license for reargument, it may quite properly be regarded as the right to come back in light of changed circumstances.

### Conclusion

Once more, the Court needs to repeat an observation the Second Circuit made in *Caldor:*

In deciding what constitutes "adequate assurance" in a given case, a bankruptcy court must "focus upon the need of the utility for assurance, and to require that the debtor supply *no more than that,*

since the debtor almost perforce has a conflicting need to conserve scarce financial resources."

117 F.3d at 650 (emphasis in original). The asset-liability mix in this case, coupled with Distant Early Warning measures and other conditions crafted to minimize the risk to the Objecting Utilities, give this Court comfort that the Objecting Utilities will not be subject to undue risk of non-payment. And under the facts of this case, where the amounts owed by the Objecting Utilities to the ABIZ Entities may well exceed the amounts owed by the ABIZ Entities to the Objecting Utilities, it is particularly inappropriate to drain scarce financial resources to fund deposits to give the Objecting Utilities further assurances in this regard.

Subject to the conditions just set forth, the Court finds adequate assurance of payment to the Objecting Utilities. The Debtors are to settle an order on notice. The time to appeal will run from the entry of that order, and not the date of this decision.

---

129. As a practical matter, however, the Court is not in a position to determine disputes of the technical complexity or volume underlying many of the parties' underlying disputes, though it will provide expedited reconsideration after resolution, in whole or in material part, by any other means.

130. Section 366(b) goes on to provide:

On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.